## RIPKA v. PHILCO CORPORATION.

District Court, S. D. New York.

Sept. 28, 1945.

On Motion Nov. 7, 1945.

Emanuel Becker, of New York City (Abraham N. Davis, of New York City, of counsel), for plaintiff.

Sullivan & Cromwell, of New York City (John F. Dooling, Jr., of New York City, of counsel), for defendant.

LEIBELL, District Judge.

Plaintiff, the assignee of Benjamin A. Javits as trustee, and of Jacob K. Javits as trustee, and of Benjamin A. Javits and Jacob K. Javits, copartners, sues for a rescission of the sale to Philco Corporation of 25,000 shares of common stock of National Union Radio Corporation, made by plaintiff's assignors on April 14, 1942, for $16,862.50, after negotiations that will be hereinafter discussed in some detail. The basis for the rescission as pleaded in the first cause of action is that plaintiff's assignors were induced to sell the stock to the defendant, Philco Corporation, through misrepresentations of material facts, made to Benjamin Javits by Sylvester Muldowny, President of National Union, who had been authorized and empowered by a resolution of Philco's Board of Directors adopted March 9, 1942, to purchase the Javits stock for Philco (Ex. 14). In the second cause of action plaintiff's assignors charge the defendant with fraud and deceit, in that the misrepresentations were known by Philco to be false and were made to induce the sale. In my opinion both causes of action have been established.

Philco at the time owned 833,333 shares of National Union common stock, all of

the 250,000 shares of its preferred stock, and $770,000 principal amount of National Union's 3% debentures. Sears Roebuck owned 100,000 shares of National Union common stock and the Galvin Corporation owned 35,000 shares. The annual reports of National Union (Exs. M3 and M4) show that Mr. Brooks represented Sears Roebuck on the Board of Directors of National Union and Mr. Galvin represented Galvin Mfg. Co. Mr. Wilson, Treasurer of Philco and another Philco representative also served on the Board of National Union. Mr. Muldowny and a Mr. Crowly were members—six in all.

The representations in connection with the sale are alleged in paragraph "4" of the complaint, as follows:

"4. That immediately prior to April 14, 1942, Philco, in order to induce the Vendors to sell their shares of National Union common stock to Philco at the price of $.67½ per share, less transfer taxes, made each of the following material representations to said Vendors:

"(a) Philco intended promptly to merge or consolidate with National Union;

"(b) For the purpose of determining the value of National Union common stock in the event any holders of said common stock of National Union dissented from the proposed plan of merger or consolidation of National Union and Philco, Philco had obtained a written independent and complete appraisal of the fair value of said shares of stock from George Armstrong & Company, a firm of engineers; and said George Armstrong & Company had appraised such shares of stock at $.67½ per share (hereinafter referred to as the 'Armstrong report');

"(c) The stockholders of National Union who did not assent to the merger or consolidation of Philco and National Union would be paid $.67½ per share in accordance with the appraisal aforesaid;

"(d) The Armstrong report in appraising the value of the common stock of National Union had given full consideration and effect to the future prospects of National Union, its earning capacity, its participation in war business, and the general effect of the war economy;

"(e) The Armstrong report stated that the manufacture of war products and for war purposes by National Union was an extremely hazardous enterprise, that profits

from such undertakings were improbable and that the risk of loss was great;

"(f) The directors of National Union Corporation believed that the manufacture of war products and for war purposes by National Union Radio Corporation was an extremely hazardous enterprise, that profits were improbable and the risk of loss great;

"(g) Philco was desirous of acquiring all or almost all of the stock of National Union;

"(h) Philco would not pay, and up to the time of said representations, had not paid more than $.67½ per share for any of the shares of stock of National Union;

"(i) All of the holders of large numbers of shares of common stock of National Union Radio Corporation, with the exception of Nathan Chirelstein and including Sears Roebuck & Company and P. V. Galvin, a director of National Union, both holders of large amounts of shares of National Union, had agreed to sell their shares of stock at the price of $.67½ per share."

Before Mr. Muldowny visited Mr. Javits on March 23, 1942, to persuade him to sell his stock to Philco, the officers of Philco had been advised by their attorneys as to the procedure to be followed in a statutory merger of National Union and Philco as indicated in Exhibit 11, dated December 6, 1941. Mr. Andrews of Ballard, Spahr, Andrews & Ingersoll had written Mr. Cheston of Philco concerning merger procedure (Ex.11) substantially as follows:

The statutory merger contemplated an exchange of Philco stock for National Union stock. The rate of that exchange would be the subject of an agreement between the two corporations. Appropriate resolutions by their respective Boards of Directors would be adopted approving the agreement and calling a shareholders meeting to vote upon the proposals. The meeting could be either special or annual. A majority vote of Philco's shares and a two-thirds vote of National Union shares would be required to approve the merger. Philco, Sears and Motorola (Galvin) then had (with the preferred unconverted) approximately 70% of the voting power of National Union. A dissatisfied shareholder of either company could apply for an appraisal of his shares and he would be entitled to receive in cash the value de-

termined by independent appraisers, with provisions for appeal to the courts. Mr. Andrews suggested that the minority stockholders of National Union be made "an alternative cash or stock offer by specifying only Philco shares in the merger agreement, but by having Philco offer the equivalent in cash for National shares tendered to it at any time prior to the National Union shareholders' meeting." He also advised that it would "be economical to wait until the December 31, 1941 statements of each company" were available since financial statements would be required as part of the proxy statements. Mr. Andrews' letter recommended that Philco not convert its holdings of National Union preferred stock into common stock, because that would add to the value of National Union common stock.

Mr. Andrews also touched upon the valuation of National Union common stock for merger purposes. He wrote: "in determining the value of National Union common for merger purposes, consideration should be given to its earnings record, to its quoted market values weighted over a period and to a present estimate of its net asset values. No one of these factors can be used alone, and it would probably prove sound to err on the liberal side". He concluded his letter with the sentence "We have not touched upon tax problems or other business advantages or disadvantages of a merger, as you and your associates already have all of these factors under consideration".

Mr. Andrews had written to Mr. Cheston January 2, 1941 (Ex. 13) concerning Philco's then objectives and what was then considered an ideal National Union plan "one which left National Union with three shareholders, Philco, Sears and Motorola; the last two having the equivalent of their present interest (9.7%) and Philco having the balance (92.3%)". He discussed the so-called Simplex plan, which he advised against. He suggested instead two other programs—the first a statutory merger under the laws of Pennsylvania and Delaware and "the price could be" in terms of Philco shares, supplemented by a cash offer for all additional National Union shares tendered prior to the shareholders' meetings. "The other program would be to endeavor from time to time to buy additional National Union shares until the minority became relatively unimportant." [The latter appears to have been the plan that Philco followed.] He warned that a buying program would never get in all the stock and that "as time went on shares would become more expensive and in the end it might be the trouble makers who were the standouts." The following excerpts from his letter also throw light on the reasons why Philco might wish to merge National Union, and his conclusions:

"As we see it, there are two principal reasons for wishing to eliminate the National Union minority. The first, and to us the less important, is to avoid accomplishing results for the benefit of others than Philco. The second reason, and to us the more important, is to get out of the dilemma of either being in a straitjacket in the management of National Union or of taking the risk of being attacked by minority shareholders.

\* \* \* \* \*

"To summarize, the clean cut and safe method of eliminating the minority interest is by a statutory merger. The possible disadvantages are in relation to excess profits tax and the Sears and Motorola stock interests. As respects the first, we doubt whether any excess profits tax disadvantage would in the end be as expensive as a substantial National Union minority interest. As respects the second, we would hope that Sears, for instance, even if not interested in owning Philco shares, would not be prejudiced by the loss of its stock interest in the tube company. The interest is insignificant in comparison with Sears' potential customer position and profits."

Mr. Wilson, Philco's treasurer, knew on March 5, 1942, that the Armstrong report would show a valuation of 67½¢ a share for National Union stock. The report took the net worth of the corporation as shown by the books as its going concern value, in view of the absence of any indicated earnings since the date of National Union's incorporation in 1929. On March 13, 1942, Armstrong & Co. sent to Mr. Wilson the Armstrong report on the value of National Union as a going concern (Exs. 1 and Q).

Mr. Wilson, as Philco's treasurer, had also received the opinion of its tax experts, Mathieson, Aitken & Co. (Exs. 15 and 16), dated March 2, 1942, who advised of certain substantial disadvantages taxwise that would result from a merger of National Union into Philco. Because this tax ques-

tion loomed so large Philco's directors decided that the proposal for a statutory merger should not be submitted to the stockholders of the respective corporations. At some time prior to March 16, 1942 the form of notice etc. for the annual meeting of Philco (scheduled for April 17, 1942) was changed, omitting from the drafts prepared by their attorneys (Exs. Pl–2 and 3) all reference to any merger of National Union with Philco. This change was made prior to the submission of the form of notice, proxy statement, etc. to the Securities and Exchange Commission for its approval on March 16, 1942. Only two matters were listed in the notice for the meeting and in the proxy, as requiring action at the annual meeting. The notice and proxy said nothing about any proposed merger. Mr. Javits signed a proxy April 18, 1942, for the National Union stockholders meeting of May 1, 1942. He had sold his stock to Philco on April 14, 1942, but it had not been transferred on the books of the corporation, which had been closed as of March 31, 1942, limiting the right to vote to the owners of record of that date (Ex. 19).

Mr. Javits was told when he was approached by Muldowny and asked to sell his stock, that National Union was going to be merged with Philco through a statutory merger. His first conference with Muldowny on the subject was March 23, 1942. Lehman Bros. were told the same story. The Javits sold their 25,000 shares to Philco on April 14, 1942, and on the same day Lehman Bros. sold their 60,239 shares of National Union common stock to Philco. Mr. Philip F. Siff, associated with Lehman, was also told of the proposed merger; so he and Mary L. Siff sold a total of 3550 shares of National Union common stock to Philco, April 21, 1942. Mr. Muldowny had told Javits that he intended to sell to Philco his own 10,000 shares which he had received as a bonus. He made his sale April 17, 1942. Of course, if he was sent out to contact other large stockholders to get them to sell, he could hardly say that he was going to hold on to his own stock. Exhibit FF shows the purchases which Philco made between April 14, 1942 and May 6, 1942, totalling 111,489 shares of National Union common stock.

On May 28, 1942, Philco sent a printed letter (Ex. A) to the National Union common stockholders stating that Philco had "recently purchased more than 100,000 shares from several of the larger holders at 67½¢ a share." The letter stated:

"This price was offered on the basis of a report to Philco by George S. Armstrong & Co. Inc. Industrial Engineers, to the effect that this price, which is substantially the same as book value at December 31, 1941, represented in its opinion the value of the common stock at that date on a going concern basis."

The letter of May 28, 1942, also stated that Philco owned all of the 250,000 shares of National Union's preferred stock and 859,822 shares of the 1,347,286⅛ outstanding shares of the common stock; that those holdings gave Philco 69% voting power, and that if the preferred stock were converted into common, Philco's voting power would be 72%. The letter of May 28, 1942, also stated:

"Philco has decided to give all holders of National Union common stock the opportunity to sell their shares at the same price as it has paid to larger holders."

The letter contained no statement that it was the purpose of Philco to merge National Union with Philco. No intimation of a statutory merger was given, if the stock was not sold.

By a letter of July 31, 1942 (Ex. K) sent to National Union common stockholders, Philco extended until September 30, 1944, its offer to purchase the National Union common shares at 67½¢ per share, less transfer taxes. The right was reserved to terminate the offer at an earlier date.

Through the acceptance by stockholders of the general offer thus made, Philco purchased 86,008 additional shares at 67½¢ and on January 16, 1943 purchased 2,000 shares from a stockholder at 75¢. Thus between April 1942 and January 1943, both inclusive, Philco acquired from minority stockholders of National Union 199,497 shares of National Union common stock and added almost 15% to Philco's voting power in National Union, if the preferred stock were not converted. Sears Roebuck held 100,000 shares and Galvin 35,000 shares—another 10%. The three then controlled 94% of National Union's common stock, with the preferred not converted. One point to be noted is that Philco got control of enough stock to give it the requisite 80% voting power to carry out plan #5 mentioned in the Mathieson, Aitken & Co. letters of March 2, 1942 (Exs. 15 and 16), as having some merit

in affording a non-taxable liquidation of National Union, although it would not preserve the operating deficit of National Union.

Apparently Philco in March 1942 decided to follow a course that may be summarized as follows: Mr. Muldowny was to go to some of the larger common stockholders of National Union and tell them that Philco intended to merge National Union with Philco through a statutory merger, with its compulsory features, and that Philco had the votes to do so; but that Philco would offer in advance 67½¢ per common share, the price any dissenting stockholder would get under an appraisal. Having in this way acquired more than 100,000 shares from several of the larger holders at 67½¢ a share, the acquisition of several large blocks and the Armstrong report that the price represented going concern value were used in a general letter to other minority stockholders to persuade them to sell their stock to Philco at the same price. But they were not told anything about a prospective merger as an inducement to sell, because Philco had abandoned that plan with little likelihood of taking it up again, because of its tax disadvantages.

I am of the opinion that the statutory merger plan was dead or dying when Mr. Muldowny was sent out to buy the holdings of certain of the larger stockholders. The letters of the tax experts, Mathieson, Aitken & Co. dated March 2, 1942 (Exs. 15 and 16) gave it its death blow; and because that point is so clear, Mr. Muldowny has denied that he knew the result of the tax experts' investigation when he spoke to Javits about buying his stock in advance of the merger. He could not have reconciled talking statutory merger to Javits as a reason why Javits should sell, with the knowledge he had that the Mathieson, Aitken & Co. reports made a statutory merger strongly inadvisable tax-wise.

Mr. Muldowny testified that he had not seen the Mathieson, Aitken & Co. letters of March 2, 1942 (Exs. 15 and 16), when he spoke to Mr. Javits about buying Javits' stock; that he, Muldowny, did not then know what the result of their investigation was. He also testified that he knew that Philco was looking into the tax base of National Union but that he did not know that a statutory merger would lose the National Union tax base; that he told Javits that the tax problem might delay the merger but that Philco would go through with the merger regardless of what happened in the tax case; that up to April 14, 1942, he had not been told there would be any delay in going through with it. Mr. Wilson and Mr. Cheston of Philco and Mr. Muldowny of National Union, had had most to do with the proposed merger. Mr. Cheston had been receiving letters with advice on the merger from Philco's attorneys, Ballard, Spahr, Andrews & Ingersoll, of Philadelphia. Mr. Wilson had been in touch with Armstrong & Co. on the preparation of the valuation report (Exs. 1 and 2) and so had Mr. Muldowny. Mathieson, Aitken & Co. had reported to Mr. Wilson on the basis tax-wise of a merger or other absorption of National Union by Philco (See Exs. 15 and 16). Mr. Wilson was Philco's treasurer and a member of the National Union Board of Directors. Mr. Muldowny was President of National Union and a member of its Board, and he frequently attended meetings of Philco's Board and Executive Committee by invitation.

I regret to state that I cannot believe that Mr. Muldowny was not fully informed of the contents of Mathieson, Aitken & Co.'s letters to Philco, marked for the attention of Mr. Wilson, dated March 2, 1942 (Exs. 15 and 16). Mr. Muldowny and Mr. Wilson were both present at the special meeting of the Board of Directors of Philco held March 9, 1942, when Mr. Muldowny was authorized to contact Mr. Javits and Mr. Chirelstein to buy their National Union common stock at 67½¢ a share (Exs. 14 and 14A). Mr. Wilson had had the Mathieson, Aitken letters a week at the time. Mr. Muldowny and Mr. Wilson were both present at a special meeting of the Board of Directors of National Union held March 18, 1942 when resolutions were adopted approving certain By-Law amendments to be submitted to the stockholders at the annual meeting called for May 1, 1942. The whole record before me shows that Mr. Wilson and Mr. Muldowny worked together closely. Indeed, Mr. Muldowny testified that it was his habit to go to Philadelphia (where Philco's offices were located) every Monday and that they "have a luncheon there of all the executives". It is safe to say that Mr. Wilson would not have kept from Mr. Muldowny so important an opinion as

that of the tax experts, Mathieson, Aitken & Co. on the effect of a statutory merger on the right of Philco to use National Union's very advantageous excess profits tax base, if the merger, were carried through.

Mr. Muldowny was able to report back to the Executive Committee of Philco Corporation at a meeting held March 30, 1942 (Ex. CC) concerning his conferences with Mr. Javits and Mr. Chirelstein. The minutes contain the following paragraph:

"Mr. Muldowny reported that he had contacted Mr. Javits and the Chirelsteins with reference to the sale of National Union Radio Corporation stock held by them at a price of 67½¢ per share, in accordance with the instructions given by the Board of Directors at a meeting held on March 8, 1942. It appeared that these shares can be bought at that price and Mr. Wilson submitted a letter received from George S. Armstrong & Co., Inc., wherein the opinion is expressed that the book value of National Union Radio Corporation should be regarded as the going value. It was accordingly agreed that the officers of Philco Corporation should be authorized to purchase up to 100% of the outstanding common stock of National Union Radio Corporation, at a price of 67½¢ per share."

These minutes do not mention the Mathieson, Aitken & Co. letter of March 2, 1942 on the tax problem and the effect of a statutory merger on the use of National Union's excess profits tax base by Philco.

In his negotiations to purchase the Javits stock, Muldowny definitely linked the Armstrong report with a plan to merge National Union with Philco. Its place in that plan was to put a fair value on the National Union common stock, so as to fix a ratio of exchange of the National Union stock for Philco stock in a statutory merger of National Union into Philco, and to fix a price for the National Union common stock at which Philco would offer to buy the stock prior to the stockholders meetings to be called to pass upon the merger. It would also serve to convince any dissenters of the fairness of the price put upon their stock.

Muldowny phoned Javits for an appointment. Javits says the first conference was March 23, 1942. They had several conferences. Muldowny testified that he told Ben Javits that Philco wanted to merge with National Union; that new capital

would be needed to make National Union competitive; that Philco was not interested in putting up money to benefit other stockholders who were not helping the business; and there were organization reasons for the merger. Muldowny then said that George Armstrong & Co. had made a report that the National Union common stock was worth 67½¢ a share and Philco was planning to make that offer to all stockholders. Javits asked about the Armstrong appraisal. Muldowny did not have it with him. It was in Philadelphia at Philco's office. Javits asked if the Armstrong report took into account the future business of National Union. Muldowny answered that he thought so; that the appraisal was of National Union on a going concern value. He told Javits that Philco and National Union had prepared plans to merge and that the Armstrong report was to fix the price Philco would have to pay dissenting stockholders in event of merger.

When the 67½¢ price was fixed at the Philco Directors' meeting of March 9, 1942, as the highest price to be offered Javits, the Armstrong appraisal (which is dated March 13, 1942) had not been received, but Mr. Wilson had heard from the Armstrong people before that and knew their figure.

In a letter of December 17, 1941 (Ex. 12), addressed to Mr. Cheston, who was an officer of Philco, Mr. Andrews had discussed the advisability of having an independent appraisal of the value of National Union common stock (and perhaps of Philco's stock also) in connection with a merger of National Union into Philco.

"It seems to us that the real value of an appraisal or appraisals is as a check on the directors' judgment of a fair merger basis, as a protection in the event of criticism by the shareholders of either corporation, and to discourage any attempt to enjoin the proposed merger on the ground that the majority is exercising its power improperly and therefore fraudulently as respects the minority.

"For these reasons we think it would be sound to have an independent appraisal of National Union and to put its shares into the merger on the basis of such an appraisal. National Union shareholders could not then complain of arbitrary valuation by a controlling interest and, in fact, could have no sound basis for complaint if Philco shares were offered on a fair ex•

change basis as respects either intrinsic or market value."

Mr. Javits was a lawyer with many years of experience in the field of corporation law, including corporate mergers. He, too, knew the argumentative value of an appraisal to a minority stockholder who was asked to sell his stock preparatory to the merger.

The minutes of the Philco Board meeting of March 9, 1942 do not mention the Armstrong appraisal (dated March 13, 1942) nor do they say anything about the merger. But Mr. Wilson had heard from Armstrong five days before the meeting (Exs. DD and EE). An excerpt from the minutes (Ex. 14) shows that the intended purchase by Philco of the Javits and the Chirelstein stock was to acquire a larger common stock interest in Philco's subsidiary, National Union, and that the 67½¢ per share was the then book value of the National Union common stock and "that this might be considered to be the going concern value". Of course by the time Muldowny saw Javits on March 23rd the Armstrong report (Ex. 1) dated March 13, 1942 had been received by Philco and Muldowny admits that he had seen it before the 23rd.

Mr. Muldowny knew that Armstrong had had the report in preparation. Exhibit 30 is a memorandum made by David S. Loudon of George Armstrong & Co. Inc. dated March 2, 1942 which records the substance of a conference he had with Mr. Muldowny and Mr. Sandstrum, two directors of National Union. The first, second and fifth paragraphs of the memorandum are important as showing that Mr. Loudon was inquiring "if there might be any belief on the part of minority stockholders that the earnings of the last few years might not reflect the true earning power of the Company". Mr. Muldowny "did not see any basis for such an opinion". Mr. Muldowny also indicated to Mr. Loudon "that it was possible that the war orders now in prospect might be profitable and that some minority stockholders might so argue." Apparently it was at that conference that "Mr. Muldowny made available a copy of the appraisal and a preliminary audit report for the period ending December 31, 1941." The "appraisal" probably was that of the American Appraisal Co. referred to in Armstrong's report, Exhibit 1. The preliminary audit probably was that of Lybrand, Ross Bros. & Montgomery; their final audit statement is referred to in the Armstrong letter to Mr. Wilson dated March 13, 1942 (Ex. Q), as having been received by Armstrong.

Armstrong & Co. knew the purpose for which they were making the appraisal and the elements they were to keep in mind. They had before them a memorandum on valuation (Ex. R) prepared by Philco's attorney who had been in touch with Armstrong (see Ex. 9). The attorney had stated in the memorandum (Ex. R) the purposes of the independent appraisal as follows:

"The primary purpose of an independent appraisal is to assure merger terms which are demonstrably fair and thus to discourage criticism by shareholders of either corporation. A secondary purpose is to arrive at a value for National Union shares which should approximate the value obtainable by dissenting shareholders under the procedure prescribed by the Delaware statute."

The engineers (Armstrong & Co.) were to determine "intrinsic value." The memorandum contained the following advice for the engineers:

"In determining intrinsic value it will be sound to bear in mind the views of the Delaware courts. The only case brought to our attention which relates to valuation of shares of a dissenting shareholder under the merger statute is Chicago Corp. v. Munds, 21 Del.Ch. 142 (1934). The emphasis of the court is upon valuation as a continuing investment; that is, 'the value of the stock should be fixed as if it were a going concern, by which, of course, is meant as if the merger had never been conceived'. It should, therefore, be expected that the Delaware courts would reject replacement cost less depreciation as a sound method for valuing the assets in a merger situation in favor of an earnings basis.

"Aside from this emphasis on going concern or continuing investment, there is not much in the foregoing opinion which is helpful. Factors mentioned in the decision and in decisions to which the court refers are the usual factors of asset value, earnings past and prospective, and market prices."

"Earnings past and prospective" were factors to be considered. When Armstrong made the appraisal it was evident that the production of radio receivers for civilian use was being sharply reduced by

the Government Agency in control of priorities of critical materials (see Ex. S, order of Acting Directors of Priorities dated January 23, 1942). A further order dated March 7, 1942 dealt with the "prohibition of production of sets after April 22, 1942" (Ex. T). So that when Armstrong & Co. made its report of March 13, 1942, it was known to Mr. Muldowny, to Mr. Wilson, to National Union and Philco, that the civilian business of N. U. was almost at an end and that it would be dependent upon war orders. Hence past earnings were not a sole criterion. Prospective earnings in war production were at least of equal importance; and as to prospective earnings Armstrong & Co. had to rely on what Mr. Muldowny told them. He did not tell them much, (but he was well informed, as the minutes of meetings show) just generalities, and admittedly he was pessimistic in the views he expressed to Javits. It was in Philco's interest to keep the appraisal low. Philco controlled National Union's Board of Directors and its officers, including Mr. Muldowny.

The minutes of the Executive Committee meetings of National Union show that its executives appreciated the trend from civilian to war production as far back as October 1941. The following is quoted from the minutes of October 14, 1941 (Ex. 24):

"Mr. Muldowny stated that from his visits to Washington he believed that Cathode Ray and Power tubes were going to be used extensively for defense purposes and that, with the curtailment of radio receiving tubes, the Company would have to look to this source to make up for the loss in revenue."

He also reported that the Navy Department had made an inspection of the plant and that a report of the inspection had been received, which stated that the National Union "factory is supported by good mechanical and electrical talent and that competent engineering is keeping them abreast of developments".

At a meeting of November 14, 1941 (see Ex. 25), the chairman, Mr. Muldowny reported "in connection with special tubes for defense." National Union had an order to make 16,000 power tubes for Western Electric and 10,000 other tubes for Bendix and was conferring with the War Department concerning the possibilities of National Union being one of the suppliers of a certain new and expensive tube of which a large quantity was needed. When Mr. Wilson recommended that no commitments be made beyond the first 1,000 tubes due to uncertainty of labor and material costs, the Chairman (Mr. Muldowny) stated "that he understood it was impossible to make a quotation on this basis but he did feel certain that it was not the intention of either the Army or the Navy to hold suppliers to quotations that are made considerably in advance if subsequent labor and material increased costs make it impossible to manufacture at a profit". Manufacturers had to be kept in business if the Army and Navy were to get what they needed.

At a special meeting of the Board of Directors held December 12, 1941 (Ex. 20) the Chairman (Muldowny) reported that during a recent visit to Washington "it was rumored that set production during the last six months of 1942 will be limited to 18% of the quantity produced during the last six months of 1941." He also said that National Union "did not have sufficient information to make accurate estimates of the volume" of Cathode Ray and Power Tube business the company could expect to receive in 1942. Two of the directors were of the opinion "that some projection of estimated profits from Cathode Ray and Power tubes should be made" and Mr. Sandstrum was directed "to have the estimate prepared and included with the receiving tube budget". The chairman reported that the company had been requested to expand its existing Cathode Ray facilities from 200 tubes per day to 500 per day; and he also reported that he was going to propose that the Government finance a new building for that purpose.

At an Executive Committee meeting held February 21, 1942 (Ex. 18) Mr. Muldowny stated that the officers of the company had made application to the Defense Plant Corporation for approximately $1,166,000 for the building of a new plant at Lansdale, Pennsylvania, for the production of Cathode Ray and Power Tubes and for the addition of new facilities in the State Street Plant for the production of transmitting tubes, that the application had been approved, that the company had been offered a lease arrangement which the officers of the corporation felt was "a very fair lease", and that they had already signed it on behalf of the corporation. The directors approved this and authorized the officers to execute papers for either the construction program or the acquisition program.

There was nothing pessimistic in that prospect.

At a Special Meeting of the Board of Directors of National Union held March 18, 1942 (Ex. 19), the chairman, Mr. Muldowny, reviewed current operations. He stated that the State Street plant was entirely engaged in defense work; that production of a special and expensive tube had been started and should greatly enhance the company's reputation with the Signal Corps; that the original Bendix order for 10,000 tubes of a certain type would be completed shortly and that a new order for 10,000 had been received together with an order for 3,200 from the Signal Corps, and that it appeared that it would not be difficult to keep the equipment used in making this tube "in continuous production for the rest of the year"; that an experimental order for 250 tubes of a certain type had been received from Western Electric and that it seemed that National Union would receive shortly an order from Western Electric for 40,000 tubes; that the McCarter Highway Plant was gradually converting to defense production with Army and Navy business, and special tubes for defense were being produced for Philco, Western Electric and Galvin; and that ground would be broken for the Lansdale plant in the early part of April.

■ The minutes of an Executive Committee meeting of Philco held March 17, 1942 (Ex. 29), contain the statement: "At the present time National Union is exceeding the micropup schedule, are producing cathode ray tubes exclusively for Philco (with no intention of expanding this business to other manufacturers) and look upon the power tube types as the large part of the business in the immediate future." In fact this seems to be part of Mr. Muldowny's statement to the Philco Executive Committee at that meeting. It may be remarked here that if Philco had its completely controlled subsidiary National Union producing cathode ray tubes exclusively for Philco, the price to National Union had to be fair and include a reasonable profit. A majority stockholder has the responsibilities of a fiduciary. Pepper v. Litton, 308 U.S. 295 at page 306, 60 S.Ct. 238, 84 L.Ed. 281.

But when discussing National Union's prospects and its war business with Mr. Javits, Mr. Muldowny was very pessimistic about war profits, although he was "hopeful". At least so reads the record of Mr. Muldowny's testimony. He did not paint any rosy picture to Mr. Javits, that's certain. He wanted Mr. Javits to sell. Mr. Muldowny was one of the insiders. Mr. Javits was definitely an outsider with the Philco management. They had ousted him as a director when they took over National Union in June 1940. And in March 1941 they wanted to get rid of him as a stockholder. He was a lawyer. He had been a director. They probably considered him a prospective trouble maker, if Philco in its dealings with National Union considered Philco's interests at the expense of National Union.

Philco in addition to its preferred and common stock interest in National Union, held $770,000 of its 3% debentures, December 31, 1944. These debentures had been acquired by Philco in financing National Union, as follows: $150,000 on April 1, 1941; $400,000 on April 22, 1941, $125,000 on December 27, 1941 and $95,000 on December 27, 1941. When Muldowny spoke to Javits on March 23rd, 1942, Muldowny had already made arrangements with the Government for $1,116,000 for the construction of the Lansdale plant (Ex. 18). He told Mr. Javits about that. He also told Javits that National Union needed new capital and that Philco was not interested in putting up money to benefit minority stockholders who contributed nothing to the business. But before the actual sale of the Javits stock on April 14, 1942, Executive Order No. 9112 had been signed March 26, 1942. National Union on July 28, 1942 (according to Note B of Ex. AA), obtained a working capital loan of $1,230,-000 under Regulation V of the Federal Reserve System, based on Executive Order No. 9112. The fact appears to be that the Government furnished all the financing National Union needed in 1942. Muldowny had been going to Washington inquiring about Government orders in the latter part of 1941 and early in 1942. He was well informed.

The thought naturally arises how Mr. Javits, an experienced lawyer, could have been tricked by Mr. Muldowny. The answer is to be found in their past relations. Mr. Muldowny had been an old friend of Mr. Javits. They had been on National Union's Board of Directors together for several years. They greeted each other by their first names, abbreviated (Exs. E, G, O, 5 and 7). Javits trusted his friend Muldowny. It is the old story of a smart

man being overreached by a friend in a business deal. If Muldowny had been a stranger, Javits would have been on his guard and would not have relied so much on oral statements. The only representation made in writing to Mr. Javits (See letter of Muldowny to Javits and Javits, dated April 9, 1942 Ex. D), was that the offer of 67½¢ was at least as good as any offer made to any other stockholder so far that year, and that no better offer was being made to any other stockholder at that time. The letter (Ex. D) was sent to Javits at his request. The letter was in line with Philco's purpose to purchase the minority common stock at the Armstrong appraisal figure. To depart from that purpose in a particular instance would have disrupted the procedure Philco had laid out in advance.

Mr. Muldowny's testimony confirms Mr. Javits' statement that he informed Mr. Javits that Sears & Roebuck and Galvin had agreed to sell their stock and that Philco had agreed to take the stock. Mr. Siff of Lehman Bros. was told practically the same thing by Mr. Muldowny. In the conversations between Mr. Muldowny and Mr. Javits, the latter attached great weight to the fact that Philco was going to take the Sears & Roebuck and the Galvin stock. He considered it evidence of good faith, that Philco intended to merge, and he so informed Mr. Muldowny. Muldowny had taken the matter up with Sears and Galvin in January 1942 and had their assurances that they would go along. Apparently he spoke to Sears again in May. On July 9, 1942, Mr. Brooks of Sears & Roebuck wrote Mr. Muldowny (Ex. W) as follows: "I checked with General Wood today and he has not heard from the Philco people with respect to the sale of the National Union stock. Our position as I told you is that we will do whatever they prefer, that is, sell the stock at the price offered or continue to hold it." Up to the date of the trial Sears still owned its 100,000 shares of National Union common stock. J. P. Galvin Mfg. Co. still owned its 35,000 shares. The merger of National Union with Philco had not taken place and was not going to. The representation as to Sears and as to Galvin carried great weight with Javits not solely because of the size of their holdings, but because they were both good customers of National Union—next to Philco they were the largest purchasers of National Union tubes.

National Union and Philco would not want to offend them and would be eminently fair with them. If the proposed merger had been submitted to Sears & Roebuck and to Galvin and if they had agreed to sell their stock to Philco at the same price, then the story about the merger and Philco's firm purpose to go through with it, became more convincing, and the fairness of the price seemed certain. It was a good selling point.

The Javits were holding their National Union stock as a long term investment. Most of it had been put in family trusts. Javits did not want to sell and he so told Muldowny. The price offered was 67½¢ and the stock had been received by Javits & Javits in payment of a fee, at about $3.00 a share. So it was Muldowny's task to convince Javits that he should sell at 67½¢, because Philco through the voting control of National Union could compel Javits to give up his stock in a statutory merger, and would have the Armstrong appraisal to support the price offered dissenters. Javits knew that and discussed it with Muldowny.

Although there was no misrepresentation in what Muldowny told Javits about Sears and Galvin having said that they would go along on a merger of National into Philco and sell their stock to Philco for that purpose, the evil was in Muldowny using that statement late in March 1942 in connection with the misrepresentation to Javits that Philco then had the firm intention to merge National Union into Philco. The Sears and Galvin statements had been made in January 1942 when Philco really intended to take over National Union through a statutory merger. That was before the tax experts, Mathieson, Aitken & Co. reported on March 2, 1942, that a statutory merger was inadvisable in view of its serious tax disadvantages. When Muldowny spoke to Javits the plan for a statutory merger had practically been abandoned. If the tax experts' report gave rise to a serious doubt in the minds of Philco's officers as to the advisability of going through with the merger, and Wilson so testified, why did not Philco treat Javits as it did Sears Roebuck and Galvin, and be content with some commitment from Javits that he, too, would cooperate in a statutory merger of National Union with Philco? I believe that they did not follow that course because at that time Philco's officers and Muldowny knew that they had to aban-

don the plan for a statutory merger as too costly taxwise, and because Philco's real plan at that time was to acquire as much of the National Union minority stock as possible, excluding the Sears and Galvin holdings. Philco wanted the outstanding minority stock so as to have a freer hand in conducting National Union's business in conjunction with Philco's business and to minimize the chances of any stockholders suits attacking the Philco's management of National Union's business.

There are some references in the corporate minutes to a merger. According to the minutes of the Executive Committee of National Union, meeting held February 6, 1942 (Ex. 22), the advisability of discussing the matter of the merger with key executives was left to Mr. Muldowny. The minutes of the Executive Committee of National Union for February 12, 1942 (Ex. 18), contain an entry that Mr. Muldowny stated that in the preparation for the merger of National Union with Philco, the subsidiary corporations, Favica Holding Corp. and Sonatron Tube Co. and affiliate, National Vita Lite Corp. should be dissolved. Sonatron Tube Co. and Favica Holding Corp. were dissolved March 12, 1942 (Ex. X, p. 9).

In the minutes of the meeting of the Executive Committee of National Union held April 28, 1942 (Ex. HH) there appears the following:

"The Chairman stated that the auditors had requested the privilege of doing preliminary work as early as possible this year as they anticipated a reduction in the staff, due to employees being drafted. Mr. Wilson stated that this appeared to be the customary practice in the auditing profession this year and he could see no objection to granting this privilege but suggested that no action be taken until there was some indication of the response by stockholders to the general letter that was going to be sent out for the purpose of purchasing minority stockholders' interests. In the event National Union merged with Philco Corporation and operated as a division and not a subsidiary it might be found necessary to use Philco Corporation's auditors; therefore, no commitment should be made to Lybrand until further information was available as to future plans."

Defendant's counsel argues that this entry indicates that the plan for a statutory merger had not been abandoned. The entry shows that Philco definitely planned to circularize minority stockholders of National Union to purchase their stock and Philco did that. The quotation also shows that a merger of National Union with Philco was not at all certain. But the representation made by Muldowny to Javits was that Philco's intention to carry through a statutory merger was fixed and definite. The response of the stockholders to the general letter sent out by Philco seems to have been satisfactory in the amount of stock tendered Philco at the 67½¢ figure. But Philco did nothing about a merger, and the auditors, Lybrand, Ross Bros. & Montgomery, continued preparing annually the financial reports and statements (see Exs. X, Z and AA).

With respect to a merger of National Union into Philco the accountant experts, Mathieson, Aitken & Co., on March 2, 1942 (Ex. 15), wrote Mr. Wilson as Treasurer of Philco, a letter from which I quote the following:

"* * * attention is directed to the fact that not only is the operating deficit of National Union Radio Corporation lost in so far as invested capital of the corporation surviving the merger is concerned, but also, only the proportionate share of the basis of the assets in the hands of National Union Radio Corporation represented by the minority interest is added to invested capital of the survivor. Stated otherwise, the operating deficit of somewhere between $2,400,000 and $2,900,000.00 is lost, plus about $370,000.00 representing the difference between Philco's equity in the net basis of the assets and the cost to Philco of such equity."

Mathieson, Aitken & Co. in their said letter (Ex. 15) discussed five courses which they considered as open to Philco in respect to National Union. Only one of these was the merger of National Union into Philco, and as to that course the accountants definitely pointed out the tax disadvantages, as above indicated. The four other plans discussed by the accountants did not involve the merger of National Union into Philco. The accountants did not require more time to advise on the tax disadvantages of the merger of National Union into Philco. Mr. Wilson in his testimony as to what the directors of Philco were considering after he received the Mathieson, Aitken letter of March 2, 1942, said that they still wanted to go ahead with the merger promptly and "sought ways and

means whereby it might be done without losing that benefit" i.e. National Union's invested capital base. In the face of the accountants' unequivocal position I do not believe that they entertained any such hope for a statutory merger. According to Mr. Wilson the Philco directors seriously questioned whether they had the right to deprive their stockholders of that tax benefit if it could possibly be retained in any legal way and he testified that "it was because of that we did not permit the proxy statement to go out with such a notice in it", i.e. a notice of a proposed statutory merger of National Union into Philco. The attitude of Philco's directors as thus described by Mr. Wilson in his deposition was very different from the representation made by Muldowny to B. Javits, that Philco would go through with the merger regardless of the tax question.

The witness, Wilson, was evasive in his answers both in his deposition (Ex. 23) and in the testimony he gave at the trial. He appeared to be trying to avoid the admission that when the directors of Philco learned through the report of the accountants, Mathieson, Aitken & Co. of the serious tax disadvantages of a statutory merger, they began casting about for some plan other than a statutory merger, for acquiring the National Union minority stock and combining the business of National Union and Philco, a plan that would preserve for Philco the advantageous invested capital base of National Union in calculating Federal Excess Profits Taxes.

In reaching a decision in this case, two questions presented themselves, among others. Why did Mr. Javits wait a year until April 1943 before complaining and what prompted him to complain then? In the conversations between Muldowny and Javits leading up to the sale of the Javits stock in April 1942, the main point made by Muldowny was that Philco firmly intended to carry through a statutory merger of National Union with Philco regardless of any tax question, that Philco had made preparations to take care of any dissenting National Union stockholders, and had fortified itself with the Armstrong appraisal for that purpose. There was some discussion of how long it would take to accomplish the merger, and it seems that a year was mentioned as the time limit, even if there were dissenters. Mr. Muldowny had said in effect that the Armstrong appraisal would be good for a reasonable length of time, that the merger would go through within a reasonable length of time, certainly within a year and Javits "did not seem to object to that."

Javits says that sometime before April 1943 he made an entry in his diary to check into the matter in April. There were also other developments that must have aroused his interest. The stock of National Union began to rise on the Exchange. On March 7, 1942, a year before, it was traded in at ¼ (25¢ a share) (Ex. H). There do not appear to have been any sales between that date and March 28th, when it was sold at a low of ⅜ and at a high of ⅝. Throughout April and May 1942 the price was 9/16. From June to and inclusive of December 1942, the price was generally ⅝s; at times it reached ¾ and 11/16. In January 1943 the price ranged between ⅝ and 9/16. On February 13, 1943 it reached 1. On February 27th it was 1⅛. On March 6th it went to 1¾. On March 13th it sold at a low of 1⅞ and a high of 2¾. On April 10th, 1943, it was 2½, 2⅝. It continued to advance and on May 1st the range was 3¼ to 4¾. It then started to recede somewhat. At the end of May 1943 it was 4, 4⅜; at the end of June it was 3½, 3¾; at the end of July 3⅜, 4; at the end of August 3, 3⅜. At the end of October 1943 it was down to 2½. Its price improved generally after that reaching 4⅛, 4⅞ at the end of January 1944. On July 22, 1944, National Union common stock sold at 6, 6⅞. At the end of December 1944 it sold at 5¼, 5⅞.

Defendant argues that it was the increase in the market price of National Union common to 2½–2⅝ on April 10th, 1943 that prompted Mr. Javits to complain about the treatment he received. I think it had a good deal to do with arousing his suspicions, and properly so. The merger of National Union into Philco had not taken place. He began to suspect that the merger argument and others had been used to induce him to sell at ⅞ in April 1942, and that the statements made to him at the time were not true. He wrote to Muldowny on April 10, 1943 (Ex. G): "The situation as it appears today does not bear out the conditions upon which the stock was sold." Javits suggested that he send a check for the amount he received and "get a return of the stock". Muldowny answered April 21, 1943 (he had been out of town) that Philco had bought in a considerable amount of stock a year ago at the

same price, and that "this price was approximately the market at that time and was also the intrinsic value in the opinion of the engineers who made a report to Philco". He also stated that the present (April 1943) market price was largely speculative; that Philco was not under any obligation to Javits because of the purchase of the Javits stock; but that he would like to discuss this in person with Javits.

Javits answered in a letter dated April 22, 1943 (Ex. E) from which I quote the following:

"I have your letter of April 21st. The facts speak for themselves. I had no interest in selling the stock until you came to me and said, among other things, that Philco had gotten engineers to appraise the value of the stock, that this was preparatory to effecting a consolidation and that they seriously intended to force the consolidation. As lawyers we knew they could well do this.

"The set-up, together with what you told me, indicated clearly that there was nothing else to do, and in order to avoid a litigation or a hold-out position, the stock was sold. It was sold, however, with no possible intention, even in the remotest way, of seeing the situation remain in status quo since as you know, I have had complete confidence that eventually this whole area of electronics would have to benefit your company. I could not do anything at least for one year because it was during this year that I understood Philco would take action to effect consolidation."

Mr. Muldowny replied on April 30, 1943 (Ex. O). He said that National Union's earnings for 1942 had amounted to only 3¢ a share for the common stock after allocating 37% of earnings to the Preferred, and that those results did not justify the current market price. He also wrote:

"On the subject of consolidation, I told you a year ago that Philco was considering putting the two companies together but as you will remember I also said that it depended upon whether a number of obstacles could be overcome. I am told that a satisfactory solution to one of the most important, taxes, has not yet been found. Whether such a solution will be found and, if so, whether Philco will go ahead with a merger or consolidation are questions for which I do not know the answers."

[Muldowny knew, when negotiating with Javits, that the tax experts had reported that there was no way in which the tax obstacle to a statutory merger could be overcome. He testified that he told Javits in substance that "it was the intention of Philco very definitely to go through with the merger, regardless of what happened in the tax case".]

Apparently Philco then got its lawyers into the controversy. There were conferences with Ben Javits, but they did not bring about a solution. On August 6, 1943, Benjamin Javits wrote a letter (Ex. L) to Philco's attorney Mr. Andrews of Ballard, Spahr, Andrews & Ingersoll and set forth certain representations made to Javits and to one of his associates, Capt. Levitan, who owned 500 shares. The letter is reproduced in a footnote.[1] Mr. Andrews answered it on August 6th and said that it had not changed his opinion, that there was no basis for a suit against Philco and that Muldowny's recollection of his conversations

---

[1] August 6, 1943

Schofield Andrews, Esq.,
  Land Title Building
  Philadelphia, Penna.
Dear Mr. Andrews:
  The representations made to Captain Levitan and to us which induced us to sell the National Union Radio stock to Philco were as follows:
  1. Philco would effect a merger with National Union within the year.
  2. Competent engineers had made a fulsome and detailed appraisal of the net worth of the corporation and had in fixing this worth, given full effect to the future and the potentialities of the business, and war business and other factors in a war economy had been fully weighted in the appraisal.

  3. Other large holders like Muldowny, Lehman, Sears Roebuck and Galvin had agreed to sell their stock at the appraised price; that all other stockholders would be solicited to accept the appraised value for their stock and if they did not sell would be subject to whatever action the company took in order that the appraised value of the stock should be controlling in the situation. In that connection I requested and received assurance that if any higher price was paid on or before the time of consolidation we would receive said price.
  4. Philco was to advance $500,000 at or about that time and would advance another $500,000 in October when Lansdale was finished and that this was preparatory to a consolidation since Philco would

with Javits as to the sale differed materially from Javits'. On September 1, 1943 Javits wrote Muldowny that Andrews' letter left Javits no alternative except to take action (Ex. Z). On September 18, 1943, Javits wrote the Ballard firm a formal letter (Ex. 2, reproduced in a footnote[2]) setting forth a list of nine representations made to him by Muldowny to induce Javits to sell; stated that they were untrue; and

---

not deem it advisable to so greatly finance National Union unless it was wholly owned.

Since this is a personal note, let me add that I was surprised to hear from you that neither Sears Roebuck nor Galvin had sold their stock or given up their options. I am also aware that higher prices than the appraisal were paid, which you confirmed.

The appraisers may have had discussions concerning these representations but the appraisal itself appears only to show book value and not to have considered those factors which were represented to both Levitan and us. Of course I understand that there were no written orders for the appraisal.

It is very much on my mind that for years I had told Syl that I did not wish to sell my stock because of my confidence in the future of the business, and that I was selling the stock on the representations made and because I wish to avoid appraisal litigation when the consolidation was effected.

I am quite anxious, as you know, to dispose of the matter promptly, and since this is an informal note it is sent without prejudice and only because of your request.

I have read this letter to Captain Levitan, and he agrees with its contents as being in accordance with his understanding. A copy is going to Syl.

I trust our relations will continue to be most cordial.

Very truly yours,

[2] September 18, 1943.

Ballard, Spahr, Andrews & Ingersoll, Esqs.,
1035 Land Title Building,
Philadelphia, Pa.

Dear Sirs:

On April 14, 1942, I sold to Philco Corporation 25,000 shares of common stock of National Union Radio Corporation, for the sum of $16,875. on behalf of myself, as trustee, under two Indentures of Trust, both dated December 24, 1937, on behalf of Jacob K. Javits, as trustee under an Indenture of Trust dated December 24, 1937, and on behalf of my firm. These sales were induced by the following representations made to me or to my associate, Captain Levitan, by Philco Corporation and/or its representatives:

1. Philco Corporation intended promptly to merge or consolidate with National Union Radio Corporation;

2. For the purpose of determining the value of National Union Radio Corporation common stock in the event any holders thereof dissented from the proposed plan of merger or consolidation, Philco Corporation had obtained a written independent and complete appraisal of said shares of stock by George Armstrong & Company, a firm of engineers, and said George Armstrong & Company had appraised such shares of stock at 67-1/2¢.

3. The stockholders of National Union Radio Corporation who did not assent to the proposed merger or consolidation would receive the foregoing amount.

4. The Armstrong report, in appraising the value of the common stock of National Union Radio Corporation, had given full consideration and effect to the future prospects of National Union Radio Corporation, its earnings capacity, its participation in war business, and the general effect of the war economy.

5. The Armstrong report stated that the manufacture of war products and for war purposes by National Union Radio Corporation was an extremely hazardous enterprise, that profits were improbable, and the risk of loss great.

6. The directors of National Union Radio Corporation believed that the manufacture of war products and for war purposes by National Union Radio Corporation was an extremely hazardous enterprise, that profits were improbable and the risk of loss great.

7. Philco Corporation desired to acquire substantially all of the stock of National Union Radio Corporation.

8. Philco Corporation would not pay, and up to the time of its representations to me, had not paid more than 67-1/2¢ per share for any of the shares of stock of National Union Radio Corporation.

9. All of the holders of large numbers of shares of common stock of National Union Radio Corporation, with the exception of Nathan Chirelstein, but including Sears Roebuck & Company and P. V. Galvin, a director of National Union Radio Corporation, had agreed to sell their shares of stock at the price of 67-1/2¢ per share.

In view of the fact that each of these representations was substantially untrue, I demand the return of the stock sold to Philco Corporation in reliance on the truth thereof.

Will you please advise me of the time when and the place where I can make

that he Javits relied on the truth of the statements. Javits asked that he be advised of the time when and the place where he could make a formal tender of the sum of $16,875. He asked to be advised if Philco did not intend to honor such a tender.

On September 24, 1943 (see Ex. 3), the Ballard firm acknowledged receipt of the Javits letter of September 18th, and stated:

"Our client advises us that the charge of misrepresentation made by you is wholly unfounded and that your letter misstates or distorts the true facts.

"As a formal tender to Philco of the sum paid by it for the stock would be refused, there would seem to be no necessity for the making of any such tender."

This suit was commenced in the New York State Supreme Court in March 1944 and it was removed by the defendant to this court because of diversity of citizenship.

To establish a cause of action for rescission an intention to misstate a material fact need not be proved. Bloomquist v. Farson, 222 N.Y. 375, 118 N.E. 855; Lindlots Realty Corporation v. County of Suffolk, 278 N.Y. 45, 15 N.E.2d 393, 116 A.L.R. 1401. If the misstatement of a material fact was made in order to induce the sale and if it actually influenced the vendors to sell, the vendors are entitled to a rescission. That the misstatements in the case at bar were deliberately made has been clearly shown. I am convinced that there was a purpose to deceive on the part of Muldowny, who acted as Philco's agent.

A misstatement of a state of mind or of the purchaser's intention may be a misstatement of fact. Edington v. Fitzmaurice, 29 Law Rep. 479; Old Colony Trust Co. v. Dubuque, C.C., 89 F. 794; Adams v. Gillig, 199 N.Y. 314, 92 N.E. 670, 32 L.R.A.,N.S., 127, 20 Ann.Cas. 910. Muldowny deliberately misstated Philco's state of mind, that is Philco's intention in respect to a statutory merger of National Union into Philco. That was a material misrepresentation and it induced Javits to sell. Javits told Muldowny in substance that if Philco was going to merge with National Union, he, Javits, had no alter-

native, he would have to give up his stock; that if it was to be a statutory merger he was bound to lose his stock any way; that they were going to take it away from him.

Rescission is not claimed because of any misrepresentation as to the value of National Union common stock in April 1942, or the fairness of the price then paid the Javits. According to the stock market quotations of sales of National Union stock in small lots in March and April 1942, the price paid the Javits was not unfair. Plaintiff contends that the Javits did not wish to sell, that they were holding the stock as an investment (nearly all of it in family trusts) having confidence in the future development of electronic devices and tubes. The Javits claim that the compulsion of a statutory merger of National Union into Philco was held over them; that it was firmly and definitely represented by Muldowny that Philco intended to go through with its plans for a statutory merger of National Union into Philco; that the merger would be accomplished within a year at the outside, even if dissenters caused some delay; and that the merger would be carried through regardless of any tax question involved.

Muldowny also misrepresented to Javits the scope, basis and contents of the report of Armstrong & Co. saying that it took into account the future prospects of the company—its war business—and that Armstrong & Co. were also of the opinion that the war business would not be profitable to National Union. However, Muldowny seems to have been Armstrong & Co.'s main source of information as to prospective war profits. The picture he gave Armstrong & Co. was not that which is discernible in the minutes of the meetings of the Executive Committees and directors of Philco and of National. Muldowny told Loudon of Armstrong & Co. on March 2, 1942 (Ex. 30) that it was "possible" that the war orders in prospect "might be profitable." The Armstrong appraisal was as of December 31, 1941.

Muldowny also misrepresented to Javits, Muldowny's own belief and that of the Boards of Directors of National Union, as to the degree of risk attached to the fulfillment of Government war orders and as to

---

a formal tender of the sum of $16,875. In the event that Philco Corporation does not intend to honor such tender at the present time or at any time in the

future, will you also please so advise me.

**Very truly yours,**

the possibility of profits therefrom. The minutes indicate that both Muldowny and the directors of Philco and of National Union believed that National Union would get all the war business it could handle and on a profitable basis. Indeed, it hardly seems reasonable that Muldowny would be making such efforts as the minutes disclose to get war orders for National if he entertained serious doubts about National's ability to fill the orders and at a profit. It further appears that Philco also was taking war orders, and had subcontracted some part of them with National Union. The explanation Muldowny gave at the trial, that he was interested in getting the war orders because he wanted to help the war effort, is not very convincing.

The representations which Muldowny made to Javits were made to induce Javits to sell the stock. The representations were factual and material and Javits relied on them in making the sale. The representations were false and were known to Muldowny to be false. He was Philco's agent, formally authorized by Philco's Board of Directors to act for Philco in making the purchase. Philco is responsible for what its agent Muldowny said and did in persuading the Javits to sell their stock. Philco got the stock and has thus received the benefit of Muldowny's acts. A court of equity should not allow Philco to retain the stock. The sale should be rescinded and the stock delivered over to plaintiff upon the payment to Philco of the amount Philco paid the Javits for the stock. I am filing herewith findings of fact and conclusions of law and I have directed a judgment for plaintiff on both causes of action.

### On Defendant's Motion to Fix Amount of Supersedeas Bond.

Plaintiff as assignee brought suit for a rescission of the sale of 25,000 shares of National Union Radio Corporation stock made by plaintiff's assignors to the defendant, Philco Corporation, on April 14, 1942 for $16,862.50.

In the first cause of action of the complaint it was alleged that plaintiff's assignors were induced to sell the stock to the defendant, Philco Corporation, through the misrepresentation of material facts made by the defendant. In the second cause of action plaintiff charged the defendant with fraud and deceit, alleging that the misrepresentations were known by the defendant to be false and were made to induce the sale. The action was tried before me, without a jury in June 1945. On September 28, 1945, I filed my opinion and decision herein, and on October 8th I filed a supplemental finding of fact and conclusion of law. The following conclusions of law are quoted from my decision:

"I. Plaintiff, Paul Ripka, is entitled to judgment on the merits against the defendant, Philco Corporation, on both claims or causes of action pleaded in the complaint herein.

"II. Plaintiff, Paul Ripka, is entitled to a judgment against the defendant, Philco Corporation, rescinding the sale of 25,000 shares of National Union Radio Corporation common stock made by plaintiff's assignors to Philco Corporation for $16,862.-50 on April 14, 1942.

"III. The judgment will provide that Philco Corporation deliver to plaintiff, Paul Ripka, 25,000 shares of National Union Radio Corporation common stock, in proper form transferable on delivery, upon the payment by plaintiff, Paul Ripka, to Philco Corporation of the sum of $16,862.50 in cash.

"III-A. The judgment will additionally provide for the payment by plaintiff, Paul Ripka, to Philco Corporation of interest on said sum of $16,862.50 at the rate of 6% per annum from April 14, 1942 to April 22, 1943."

On October 9th a judgment was entered herein, from which the following is quoted:

"Ordered, adjudged and decreed that the sale on April 14, 1942 of 25,000 shares of common stock of National Union Radio Corporation made by plaintiff's assignors to defendant Philco Corporation for the sum of $16,862.50 be and the same hereby is rescinded; and it is further

"Ordered, adjudged and decreed that the defendant Philco Corporation shall on or before November 5, 1945 deliver to the plaintiff, Paul Ripka, at the office of his attorney, Emanuel Becker, 165 Broadway, New York City, 25,000 shares of common stock of National Union Radio Corporation in proper form to be transferable on delivery against the concurrent payment by Paul Ripka to Philco Corporation of the sum of $16,862.50 with interest from April 14, 1942 to April 22, 1943, in cash or by certified checks; and it is further

"Ordered, adjudged and decreed that Philco Corporation shall serve notice upon

plaintiff during the usual business hours stating the time of its proposed delivery of such shares of stock at least twenty-four hours prior thereto but not later than the morning of November 2, 1945; and it is further

"Ordered, adjudged and decreed that plaintiff recover of defendant Thirty Dollars, his costs in this action as stipulated."

The defendant has filed a notice of appeal to the Circuit Court of Appeals from the aforesaid judgment and now applies to this Court, pursuant to Rule 28 of our Civil Rules, to have this Court fix the amount of the supersedeas bond to be furnished by the defendant pursuant to Rule 73(d), F.R.C.P. and Rule 62(d), 28 U.S. C.A. following section 723c, so that the judgment may be stayed pending the appeal. The pertinent provision of Rule 73(d) is the last sentence of that subdivision, which reads as follows:

"When the judgment determines the disposition of the property in controversy as in real actions, replevin, and actions to foreclose mortgages or when such property is in the custody of the marshal or when the proceeds of such property or a bond for its value is in the custody or control of the court, the amount of the supersedeas bond shall be fixed at such sum only as will secure the amount recovered for the use and detention of the property, the costs of the action, costs on appeal, interest, and damages for delay."

No amount was allowed in the judgment "for the use and detention of the property". The costs of the action as taxed amount to $30.00.

Rule 12 of the Circuit Court of Appeals for the Second Circuit provides:

"When a supersedeas bond is proper, such bond may be obtained in the manner provided by Rule 73, subdivision (d) of the Federal Rules of Civil Procedure. The provisions of subdivisions (e) and (f) of said rule shall apply to such bond."

Subdivision (e) deals with the failure to file, or the insufficiency of a supersedeas bond; subdivision (f) relates to the liability of the surety, which may be enforced by motion without the necessity of an independent action.

Subdivision (c) of Rule 73, F.R.C.P., provides:

"Whenever a bond for costs on appeal is required by law, the bond shall be filed with the notice of appeal. The bond shall be in the sum of two hundred and fifty dollars, unless the court fixes a different amount or unless a supersedeas bond is filed, in which event no separate bond on appeal is required."

Rule 28 of our Local Rules, in relation to a supersedeas bond, provides:

"An appellant desiring to stay the enforcement of a judgment for a sum of money only may, ex parte, present for approval a supersedeas bond as required by the provisions of F.R.C.P. 73(d). The bond shall be in the amount of the judgment, plus 11 per cent to cover interest and such damages for delay as may be awarded, plus $250 to cover costs. * * * When the stay may be effected solely by the giving of the supersedeas bond, but the judgment or order is not solely for a sum of money, the court shall make its order on notice fixing the amount of the bond. In all other cases, it may grant a stay on notice on such terms as to security and otherwise as it may deem fit and proper."

Defendant argues that in fixing the amount of the supersedeas bond the Court should consider the value of the 25,000 shares of stock as if it were the amount of a moneyed judgment, and that the 11% should be calculated on that sum. The value of the stock on the date of the judgment, October 9th, was $6 a share. In determining the value of the judgment I think it would be more equitable to take the value of the stock as of November 5, 1945, the date when the defendant was ordered to deliver the stock to the plaintiff by the terms of the judgment. On November 5, 1945, the stock sold within a range of 7 to 7¼. Taking $175,000 as the value of the 25,000 shares as of November 5, 1945, 11% thereof would amount to $19,250. According to the defendant's contention the amount of the supersedeas bond should be that sum plus $30 costs in the lower court, plus $250 for costs in the Circuit Court of Appeals, or a total of $19,530.

Plaintiff on the other hand contends that the Court should require (1) that defendant deliver to the Clerk of the Court, the 25,000 shares of stock, properly endorsed, and (2) that the supersedeas bond should cover (a) the costs of the action as taxed in this court, (b) the costs on appeal, (c) interest on the value of the stock from November 5th to the date of the delivery of the said shares of stock, (d) damages

resulting from any decline in the market value of the stock between November 5, 1945 and the date of delivery.

█ National Union Radio is listed on the New York Curb Exchange. Plaintiff argues that, because of the record of fluctuation in the market price of the stock, it might decline as much as 6 points and that therefore the supersedeas bond should include an amount of $150,000 to cover damages for delay. The expression "damages for delay" means "damages arising from the delay occasioned by the proceedings in error or appeal, which are property legal damage to the party delayed". American Trust Co. v. Speers Sand & Clay Works, D.C., 60 F.2d 994, 997. And that was the interpretation given to the provision of the old 29th Rule of the United States Supreme Court in relation to supersedeas bond where the expression used was "just damages for delay." On this motion the question is presented whether the decline in the market value of the stock, which might take place between November 5, 1945 and the date when the defendant finally complies with the decree if the judgment is affirmed on appeal, should be defined as legal damages attributable to the delay occasioned by the appeal.

The papers on this motion show that this stock has fluctuated in the year 1945 between a low of 5 and a high of 7¼, and that in the year 1944 the price ranged between 3¾ and 7⅜. It seems to me that just damages for the delay occasioned by the appeal should include any depreciation in the value of the stock between November 5, 1945 and the date when the stock is actually delivered to the plaintiff, if the judgment is affirmed on the appeal. If that were permitted under the decisions and the rules, I believe that an allowance for a possible 2 point depreciation in the value of the stock, or $50,000 in total value, would be proper and that such amount, instead of $19,250 (the 11% provision) should be included in the amount of the bond. However, I am bound by the decisions and the rules, and apparently depreciation in the market value of the stock pending the appeal, is not considered an element of "damages for delay" occasioned by the appeal.

In Kountze v. Omaha Hotel Co., 107 U.S. 378, 2 S.Ct. 911, 27 L.Ed. 609, which was "an action on an appeal bond given for supersedeas of execution on a decree of foreclosure rendered by the Circuit Court for the District of Nebraska," the United States Supreme Court considered "the measure of damages to be recovered on said bond." Mr. Justice Bradley, writing the majority opinion of the Court, stated 107 U.S. at page 392, 2 S.Ct. at page 923, 27 L.Ed. 609:

"The only ground of recovery upon the bond could be, (1) the depreciation of the property in market value pending the appeal; or (2) its deterioration by waste, or want of repair, or the accumulation of taxes or other burdens; or (3) the use and detention of the property pending the appeal,—that is, the rents and profits; or (4) the non-payment of the costs of the appeal, which accrued in this court; but the special verdict does not find that these costs were unpaid.

"If depreciation in market value can ever be laid as cause of legal damages on a bond in error (which we greatly doubt), it cannot be done in this case, because it is found by the special verdict that the property considerably increased in value pending the appeal. Deterioration by waste, etc., is a very different matter; but that is equally out of the question in this case, as no deterioration is shown. The defendants paid the taxes and insurance, and kept the property in repair. The principal question for consideration, therefore, is, whether the plaintiffs were entitled to recover the rents and profits, or damages for the use and detention, as it is otherwise called."

That decision was discussed and followed by Judge Chestnut in American Trust Co. v. Speers Sand & Clay Works, supra.

Counsel have not cited any case in which the obligors under a supersedeas bond have been held for the decrease in the market value of the property, which occurred while the appeal was pending. The rules do not specify any such item of legal damages.

█ I make the following disposition of this motion. If the 25,000 shares of stock are deposited with the Clerk of the Court pending the outcome of the appeal, then the amount of the supersedeas bond shall be in the sum of $19,530. If the stock is not delivered to the Clerk of the Court to be held by him subject to the further order of this Court after the appeal has been determined and if the defendant intends to retain the stock pending the appeal, then the amount of the supersedeas bond should be increased by the value of stock, i.e. by the sum of $175,000, making a total bond of $194,530.